IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. ADAMS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

RAHNDRIA ADAMS, APPELLANT.

Filed May 12, 2020.    No. A-20-074.

Appeal from the District Court for Douglas County: PETER C. BATAILLON, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Lauren A. Walag, and Brenda J. Leuck for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

MOORE, Chief Judge, and ARTERBURN and WELCH, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Rahndria Adams appeals from the order of the district court for Douglas County denying her motion to transfer her case from the district court to the juvenile court. Finding no abuse of discretion in the district court's order, we affirm.

## BACKGROUND

A criminal complaint was filed in the county court for Douglas County on May 21, 2019, charging Adams with robbery, a Class II felony. The charge related to her involvement in an incident on or about May 20. The case was bound over to district court on June 25. On July 15, Adams filed a motion to transfer to juvenile court.

- 1 -

On October 28, 2019, and January 24, 2020, the court held hearings on Adams' motion to transfer. At that hearing, the State offered exhibits 1 through 7, which were admitted into evidence. Those exhibits included a record of Adams' arrests, a juvenile intake summary and juvenile intake screening risk assessment completed at the time of her arrest on the current case, medical records of the victim who was assaulted in the course of the robbery, photographs of the crime scene, victim, and of a police officer who was assaulted by Adams, police reports, and a transcript of the testimony adduced at the preliminary hearing. Adams offered exhibits 8 through 10, which were admitted into evidence, and she offered testimony from her juvenile probation officer, Kassandra Fourney. The record was later reopened at the January hearing, and Adams offered exhibits 11 through 14, which were admitted into evidence. Her exhibits included a letter from one of her counselors, a letter of apology written by Adams to the police officer she assaulted, a report of an initial diagnostic interview and suggested treatment plan, and copies of the juvenile petitions filed with respect to four of her codefendants.

Adams' record of arrest shows that she was born in November 2002 and has been previously arrested on numerous occasions both for criminal offenses and for being a missing juvenile. In July 2018 she was placed on probation for a shoplifting charge that was amended to theft by unlawful taking arising out of an incident in early April. She was again charged with theft by unlawful taking in March 2019.

Police reports admitted into evidence at the hearing on Adams' motion to transfer describe the present offense as a carjacking that occurred on May 20, 2019, in Omaha. The victim told officers that she had finished golfing and was loading her golf clubs into her vehicle when between five and seven black male and female juveniles approached her from behind and struck her in the face and body. During an interview at the hospital, the victim told officers that she would not be able to identify the suspects because the incident happened quickly and she was trying to cover up during its course. However, she did tell officers that the first punch to her face came from a black female standing 5′2″, which punch knocked her to the ground. She told officers that she was struck multiple times in the face and body before the suspects demanded her keys and left with her vehicle. She said that she thought they were going to run her over but narrowly missed hitting her. The victim was transported to the hospital. Following a full examination including x rays and a CT scan, she was diagnosed with multiple displaced fractures to her left maxillary sinus and to the inferior wall of her left orbit. She also had numerous cuts, scrapes, and bruises to her arms, legs, and abdomen.

Officers located eight suspects with the victim's vehicle at a truck stop near Gretna, Nebraska, later the same day. After some difficulty with the arrests, and the discovery of a gun in a backpack located in the vehicle, the police transported those suspects to central police headquarters for interviewing. Adams was one of those eight suspects. Adams was one of six suspects who were uncooperative and resisted arrest. While Adams did not fight with police at the scene, after being handcuffed, she was able to free herself from the cuffs and then fled. Police were able to pursue and recapture her. The booking arrest report for Adams lists her as a black female, age 16, with a height of 5′1″.

A supplementary police report describes detectives' interview of Adams, calling her "highly uncooperative and completely out of control during the entire contact." At one point,

Adams kicked a detective, breaking the detective's fifth metacarpal in her left hand. During the interview, Adams had to be placed in a prone position and fitted with a spit mask because she was trying to spit on multiple detectives.

During a preliminary hearing, Detective Zachary Petrick testified regarding his investigation of the present incident. Petrick testified that he assisted the Gang Unit in locating the vehicle via its onboard GPS unit at a truck stop in Gretna at approximately 9 p.m. on the same evening as the carjacking, which had occurred at approximately 6:30 p.m. He testified that eight people, including Adams, were located in the vehicle and taken into custody. Petrick said that "several of the occupants . . . were being combative with the officers on scene" and that one of them began charging toward an officer before being restrained. Petrick testified that one of the suspects told investigators that seven of the eight people later found in the victim's vehicle were part of the assault of the victim. The one person who was apprehended with the other suspects who was not part of the assault had been picked up sometime during the time between the assault and the apprehension. One of the other occupants claimed responsibility for the backpack and gun located inside of it. He also admitted to being a gang member. During cross-examination, Petrick acknowledged that the investigators had not determined which suspect first punched the victim because multiple suspects matched the physical features of being a black female standing approximately 5′2″ as the victim had described.

When Adams was taken into custody on May 20, 2019, a probation officer completed a Nebraska Juvenile Intake Summary, which included an interview with Adams' guardian, her grandmother. Adams' grandmother reported that even though Adams was on probation at the present time, probation had not eliminated Adams' behavioral issues. In particular, Adams' grandmother reported that Adams had been skipping school after getting dressed and leaving in the mornings as if she were going to school. She also reported that Adams lies frequently and leaves home without permission, sometimes staying out overnight. She stated that Adams had negative friends and that she was not going to required therapy or drug and alcohol classes (partially due to transportation issues). Adams' grandmother stated that Adams smokes marijuana but was not aware of Adams using any other illicit substance.

The probation officer also interviewed Adams, who stated that she got along well with her grandmother but acknowledged that she had been skipping classes and said that her grades had fallen off because she lost motivation. Adams also acknowledged using marijuana in the past but told the probation officer that she had not smoked marijuana for two months. The probation officer wrote, "[Adams] stated that Probation is full of empty promises and she has kind of given up on it." Adams told the probation officer that she often has thoughts of suicide due to her loneliness and stated that she gets angry when people accuse her of things or doubt her and that she handles her anger by yelling and sometimes hitting things. Finally, Adams said that her friends are the same age as her and that they are positive and negative influences on her. She stated that she was not affiliated with a gang, but that she had friends who might be. The result of the intake was a recommendation that Adams be detained in the Douglas County Youth Center (DCYC). Adams has remained in custody throughout the pendency of this case and is placed at DCYC.

Fourney, who supervises high-risk juveniles, testified during the hearing on Adams' motion to transfer that she had been Adams' probation officer since approximately October 2018.

She said that Adams is viewed as a high-risk juvenile based on her score on a recent youth screening test because she scored particularly high in the school and peer categories. According to Fourney, Adams began living with her grandmother in 2003 after Adams' mother relinquished her parental rights, and her father's parental rights were terminated. Her grandmother died in August 2019 while this case was pending. As a result, a separate proceeding was filed in the juvenile court resulting in Adams becoming a ward of the State. Fourney testified that in the event this case was transferred to the juvenile court, the permanency plan in the dependency case was for Adams to temporarily live in an Omaha, Nebraska, foster home, which would be supervised by the juvenile court, before moving to California to live with her sister.

According to Fourney, Adams had not become physically violent toward others although she had destroyed school property previously. Fourney recounted a specific event at school when Adams damaged a computer but was not expelled because a few teachers and an administrator vouched for her and said that was not her ordinary behavior. Academically, Adams was doing well in school, earning mostly grades of A and B both before being incarcerated and at DCYC. She was on track to graduate according to Fourney. Adams had completed some but not all of the requirements of her prior probation order. Upon cross-examination, Fourney acknowledged that since she had been supervising Adams on probation, Adams had been arrested three times on other offenses before her robbery arrest, once for disorderly conduct, once for theft, and once for being a missing juvenile. Fourney was unaware of Adams' grandmother's statements that Adams had been skipping school and using marijuana and of Adams' own statement that probation is full of empty promises. Fourney also acknowledged that because Adams is a ward of the State, there would be funds to pay for costs related to her rehabilitation regardless of whether the case remained in district court or was transferred to juvenile court.

Fourney opined that Adams would have more opportunity to benefit from rehabilitative services if her case was transferred to the juvenile court. She noted that the juvenile court had resources to address Adams' aggressive behavior and said that Adams appeared more mature and sophisticated when she was around adults and away from her peers and friends. In particular, she mentioned that the juvenile court could place Adams at the Youth Rehabilitation and Treatment Center whereas the district court could not. Fourney acknowledged that at the time of the hearing, Adams was approximately 10 days away from turning 17 years old. She opined that the 2 years during which the juvenile court would have jurisdiction over Adams before she reached the age of majority was enough time for her to be successfully rehabilitated.

On January 24, 2020, the district court entered its order denying Adams' motion to transfer. The court reviewed the considerations under Neb. Rev. Stat. § 43-276 (Reissue 2016) for transferring a case to juvenile court and noted that it was not required to resolve each factor or weigh them in any particular way. Instead, the court balanced public protection and societal security against the practical and nonproblematic rehabilitation of Adams. The court noted that Adams, with her companions, committed the present offense by attacking a victim with no provocation whatsoever and then stealing the victim's vehicle. The court noted that the present incident occurred while Adams was already on probation in a juvenile court matter and that she had failed to comply with the terms of that probation. The court found that Adams required long-term rehabilitation--"much longer than Juvenile court could provide her"--and found that it

was in the best interests of both Adams and society at large to retain the case in the district court. Accordingly, the court denied Adams' motion to transfer her case to juvenile court.

Adams now appeals.

ASSIGNMENTS OF ERROR

Adams assigns that the district court erred in finding that the State established a sound basis to retain her case in district court and, therefore, abused its discretion in denying her motion to transfer her case to juvenile court.

STANDARD OF REVIEW

A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Bluett*, 295 Neb. 369, 889 N.W.2d 83 (2016). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

ANALYSIS

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, the robbery allegation, which is a Class II felony, puts Adams within this category of juvenile offenders.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter to juvenile court pursuant to Neb. Rev. Stat. § 29-1816(3) (Reissue 2016). Section 29-1816(3)(c) provides that "[a]n order granting or denying transfer of the case from county or district court to juvenile court shall be considered a final order for the purposes of appeal." This subsection further provides that upon entry of such an order, "any party may appeal to the Court of Appeals within ten days." In the instant case, Adams has properly perfected her appeal from the district court's denial of her motion to transfer her criminal proceeding to the juvenile court.

In the instant case, when Adams moved to transfer her case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in § 43-276(1):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period

extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim agrees to participate in mediation; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing and, "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred to juvenile court unless a sound basis exists for retaining the case in county court or district court[.]" See § 29-1816(3)(a).

As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ a balancing test by which public protection and societal security are weighed against the practical and non-problematical rehabilitation of the juvenile. *State v. Stevens*, 290 Neb. 460, 860 N.W.2d 717 (2015). In order to retain the proceedings, the court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. *Id.* The burden of proving a sound basis for retention lies with the State. *Id.* Although it is preferable for the district court to refer to all the considerations delineated by § 43-276, the statute does not require it to do so. See *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018).

Following our review of the record, we cannot find that the district court abused its discretion in denying Adams' motion to transfer the case to juvenile court. Although the district court did not explicitly set forth its analysis of each and every statutory consideration, its order clearly demonstrates that it paid appropriate attention to the relevant statutory considerations. In particular, the court considered Adams' previous history, including whether she had been convicted of prior offenses. The court noted that she was on juvenile court probation when the present offense occurred and that the evidence demonstrated that Adams repeatedly failed to comply with the terms of her probation by skipping school, staying out past her curfew, and smoking marijuana. Adams had also told a probation officer that she thought probation was full of "empty promises" and that she had "given up on it." According to her arrest record and the testimony of Petrick, Adams was arrested three times after being placed on probation in July 2018 prior to becoming involved in and arrested for the currently charged offense. This record of poor behavior supports the district court's finding that further efforts to rehabilitate Adams in the juvenile court is unlikely to be successful, particularly given the escalating violence and seriousness involved in Adams' behavior and the relatively short time period available to work with her.

The court also paid close attention to the violence of the offense and carefully considered how best to promote public safety. Adams was apprehended after participating in an utterly unprovoked carjacking where some seven juveniles punched and kicked one woman and stole her

vehicle. The victim's injuries required extensive medical treatment. While Adams' probation officer testified that she had not been physically violent before, the evidence showed that in addition to participating in the violent carjacking, Adams also assaulted an investigator. Adams kicked a detective's hand while she was being interviewed, again resulting in a broken bone. Moreover, due to her continued combativeness, Adams had to be fitted with a spit mask because she was attempting to spit on detectives during their investigation.

Based on the record we cannot find that the district court abused its discretion. The court properly considered the relevant statutory factors after conducting a hearing on Adams' motion to transfer her case. The district court properly weighed those factors and concluded that retaining the case in district court would better promote public safety due to the violence that Adams exhibited toward others, including authorities, and her failure to demonstrate meaningful rehabilitation under prior juvenile court directives.

## CONCLUSION

For the reasons discussed above, we find that the district court did not abuse its discretion in refusing to transfer Adams' case to juvenile court, and thus, we affirm.

AFFIRMED.